164342 Majestic Building Maintenance, Inc. v. Huntington Bancshares, Inc. Oral argument not to exceed 15 minutes per side. Mr. Doucette for the appellant. Good morning, Your Honors. I'd like to request six minutes for rebuttal, please. If it pleases the Court, my name is Troy Doucette. I represent the appellant, Majestic Building Maintenance. I imagine everybody in the courtroom has a checking account, probably a savings account, maybe some retirement accounts. If any of those accounts have checking options or the ability to get a check to write money against it, the law that has been established by the District Court would allow a bad actor to come in, write a purely fraudulent check against that account, cash it, receive the money for it, and there'd be absolutely nothing you could do about it if you did not buy a special program that the bank offered that is disclosed on page 18 of 24 of the fine print on the contract. What does this special program have? Is it some kind of special checks or is it something else, some kind of an ultraviolet way of determining who signed it or something? The program is not defined in the original contract that the customers enter into. Through the process, and this was not disclosed as part of the complaint either, part of the litigation process, we understand it to be called check positive pay or reverse positive pay. The bank has described this as being a program that would enable it to determine whether or not the checks were fraudulently written or not. In fact, the bank says in this case that the checks that were processed through our client's account would have been triggered as fraudulent had our client purchased this particular program that they had. And the bank is arguing, because our client did not purchase this particular program, that the bank has no obligation to even begin to think about or look at whether or not it's passing fraudulent checks, cashing them through the customer's account. This goes to UCC Article 4, which is the big argument between the parties. The baseline code, the baseline statute, as adopted by Ohio, its uniform commercial code is everywhere in the United States, is that banks have an obligation to ensure that checks they cash are properly payable. That means they're not fraudulent. It means that the entity that owns the account, the person or business or whatever it is, is actually the one writing the check or authorizing the check to be paid out of their account. The law places that obligation as the baseline on banks. It makes sense. Banks are the ones with the resources, the knowledge, the systems, the databases, the size in order to ensure these things are properly payable. UCC started years ago when everything was handwritten. And it was their obligation to make sure that even the signatures matched. That's why you have the signature cards they match against. So that's sort of the baseline requirement for banks. Just out of curiosity, do you know, do the facts show here when these apparently fraudulent checks were cashed, how that occurred? Was it at a teller window of Huntington? Yes. The perpetrator, our client's in Columbus. The perpetrator's in Cleveland. He doesn't have any idea who this is. This is what's really amazing about this. She goes into a Huntington branch, several different branches, four different checks equaling $4,000. She presents the check right there to the teller. Here's the reason that I'm asking the question. You seem to think that it's unreasonable to require a customer to purchase this added protection because banks have the means and the ability to detect fraudulent checks, and they have a duty to do so under Ohio law. That's basically it, right? That is the law, yes. Now, we're not talking about some sort of sophisticated scan or computer program here. We're talking about a crook going up to a teller window and handing a check to a teller, right? It's a fraudulent check, yes. Now, when you do that, the teller is supposed to ask for ID and verify that it's your signature on the check or the endorsement or whatever the transaction is, right? You seem to, is that right? Well, I don't know what the teller did in this case. It's not in the complaint, so I don't know. You say we all have checking accounts. When you go cash a check or you deposit somebody else's check, what do they do? They ask for your ID, right? In this case, Huntington cashed that check with cash right there without any opportunity for our client to complain about it. They ask for your ID, right? Okay. Now, you seem to say, geez, this had a hologram and it had a different color or it had a different numbering sequence or something like that, and the bank should have known. How should the bank have known? Well, I'm not saying the bank should have known. I'm saying the obligation is on the bank to figure that out. And the liability associated with cashing that check, the code says, the law says, it's on the bank. So it doesn't really matter from the customer's perspective how the bank should or could have would have. The law says it's on them. But the bank, according to the law, the bank could work out some other system. That's what at least the district court said. That is the question, right? So that is the key, is that we know that that is the baseline obligation. The question is, how can it be varied? This is precedent setting. This is not litigated very heavily. The code says, UCC says, that certain terms of the code, the UCC, can be varied by parties' agreement. That is true. But it doesn't say it's carte blanche. The code says that it has to be reasonable variations of the UCC. Is that reasonable as a question of law or fact? We believe it's a matter of law. We concede it's a matter of law. That's what the district court found. It was reasonable, right? That's right. And our position is that the district court got it wrong. And for this panel, it's really important to think about the policy associated with this. Because, again, the baseline is that the liability is there. The issue with this particular contract is that there's two things that go on in the contract, the client agreement. There's one area over here that says the parties are going to be reasonable. The bank is going to reasonably work on their account, reasonably send through the checks, payments, all this stuff. There's this one section dealing with this very specific issue that says if our client does not pay money to the bank to process these checks correctly, then the bank's liability is zero. There is none. It's either black or white. And what's amazing about that and what's really important about this is that the bank is attempting to shift its statutory obligation over to the consumer and not only shift that burden over to the consumer, but ask the consumer for money to do it, to change, to switch it back. So the bank is literally switching. You're basically arguing for a strict liability standpoint on banks. That can't possibly be. Well, I'm not arguing about strict liability. What I'm arguing is you're saying that you can't, that they have the duty and you believe it, they're trying to limit their obligation or their duty, which the code allows them to do. The question is whether it's reasonable. So that's right. The question is whether it's reasonable. So why isn't this reasonable? Good question. Thank you. The bank does not say in its agreement, we shall not be, these are the classes of things that we are not going to be responsible for. If this or that or the other thing happens, then that's off to the side. The bank is not doing that. Bank is not being reasonable. Bank is saying zero, black, white, that's it. Well, it's not zero, black, white, that's it. This disclaimer doesn't apply if the basis of the fraud was something that wouldn't be covered by the check protection service. So that alone means that it's not a blanket disclaimer. But the agreement does. That's exactly what, there is no, it says everything. It says that the bank is not liable if there is a service that's available that would have caught the fraud and you didn't pay for it. So that suggests that there are other types of fraud that wouldn't be caught by this for which they are liable. Well, that is a blanket liability. That's a blanket absolution of any responsibility to properly ensure that the checks are cashed. And by the way, this is not part of our complaint. This is a motion to dismiss stage on what is and what is not covered by the program. There's no description in the agreement that says here's what's covered or here's what's not. It doesn't even say the product's name in the agreement. So the answer to the question of what's unreasonable so far is that they didn't spell it out as completely as they should have in the agreement. They didn't say anything other than weird. Is that the answer? So they didn't spell it out. We get that. Are there any other reasons why this disclaimer is unreasonable beyond that one? The implications, the reasonableness, yes, the statute. The statute has the baseline requirement that it is the bank's responsibility. The bank cannot just slash out the UCC by contract. You have a contract to kill somebody that doesn't make it legal. Well, what you're saying is the bank is violating the UCC because there's a basic duty of due care that the bank has that cannot be disclaimed, even with coming up with funding languages and contracts and even requiring the buying of this service, that under the regulations and the UCC, what the bank did here is a violation. So we're hearing a motion to dismiss. So I guess you're saying that I know under this Cummins Insurance Society case, if what the bank is doing is manifestly unreasonable, the bank cannot disclaim all liability regardless of circumstances. That's your argument as I understand here. Yes, sir. Okay. Thank you. You have your rebuttal time. Good morning, Your Honors. Good morning. May it please the Court. Lisa Ganum on behalf of the Appellee Huntington Bank Shares, Incorporated, doing businesses as the Huntington National Bank. I'd like to direct the initial portion of my argument to Counsel for Appellants' opening hypothetical to this Court, which was that you all likely have checking accounts. People in this room have checking accounts. Those would be consumer checking accounts. That is not what this case is about. This case is about two sophisticated commercial entities that entered into a contract whereby the contract agreed to vary the default rules provided by the UCC. Is there a difference under the UCC between consumer checking accounts and business checking accounts? The agreement at issue here is related to commercial accounts, Your Honor. I'm talking about the UCC. You started by saying, oh, we all have consumer accounts. This is a commercial account. The question is, does that matter under the UCC? Your Honor, I'm not certain about the difference under the UCC between consumer and commercial because this case is focused on the agreement that governs commercial accounts. It might make a difference. Might it not with respect to reasonableness? Maybe there's a different standard for reasonableness if you've got businesses versus consumers. I don't know. Absolutely. And the case law does, in fact— What's your point? Why are you pointing out this is a business account? What difference does it make? Because commercial entities are held to higher standards when entering into contracts and as to the reasonableness that this court should use to determine whether or not the provisions contained in that contract are, in fact, reasonable. Do you have some legal authority that you could give us on that point? Absolutely, Your Honor. It was cited in our briefs. It's the Brandeis Board v. Habitat Security case. That case held that in determining the unconscionability of a commercial contract provision, the commercial plaintiff is held to a higher standard than the ordinary consumer. That's at page 24 of— Well, if that pertains only to unconscionability, that sounds like a different situation. So under Ohio law, manifestly unreasonable is akin to unconscionability. The case law delineates that manifest unreasonable— There is a reasonableness issue involved in unconscionability, but I'm not sure that this case hinges on the unconscionability of the contract necessarily. Although your opposing counsel says that it was buried in small print, so that suggests that the depositor was expected potentially to overlook it. But go ahead. Your Honor, I would submit that this case does not hinge on whether or not the contract was unconscionable because it's not. It's not unreasonable or manifestly unreasonable. You just made the unconscionability argument. I think we sort of got off the rails here. Aren't we trying to figure out whether this default provision is properly variable by agreement under the Ohio UCC? Let me start with, what does the Ohio UCC say, and does this comport with it or not? I don't think on that threshold question it probably matters whether it's a commercial or a business account, I'm guessing. That is correct, Your Honor. So the UCC allows the parties to vary the default rule by agreement. It specifically allows that. It allows that because it recognizes in the comments to the UCC that given the fast-paced banking world and the volume of transactions that occur every day, the parties need to be afforded flexibility in entering into their agreements. So here, the parties did vary that default rule under the UCC, and this is a permissible variance. He says it's unreasonable because you didn't provide enough information in the agreement as to what this disclaimer meant. At least that's what I derived out of his argument to begin with. So what do you say about that? The agreement itself defined the rights and responsibilities of the party. The specific provision that we're dealing with here put the appellant on notice that the bank had certain products that were designed to detect and prevent fraud. It was incumbent upon the appellant to talk with the bank and figure out what those products were. The UCC recognizes that it's unwise to freeze the requirements of commercial contracts because of the ever-changing standards and the fast-paced banking world. So here, if the parties had delineated in the contract itself all of the products that were available when they entered into the contract, those products could change. The types of fraud prevention products could change. The methods of fraud are constantly evolving. So it would be unwise to put those in the contract here. All the appellant needed to do was reach out to any representative at any Huntington Bank, call the Huntington Bank's number, ask about the products that would best fit his business needs. But the bank doesn't guarantee that those products are going to be foolproof or even that they will work. Instead, it says if you don't buy these things, the bank is absolved of any risk or liability, which does seem a bit unreasonable. As I understand your opposing counsel, he's saying that whether the customer enters into that contract or not, the bank has a certain basic duty of due care in managing their customers' accounts, and they can't abrogate or disclaim that duty, whether they undertake this extra layer of protection by buying these extra services or not. What do you say to that? And, Your Honor, this is not a disclaimer of liability. This is the party's defining. It does disclaim liability if you don't buy the service. And I believe Justice McKeague mentioned this earlier. It is a narrow provision that it limits liability in certain transactions that the anti-fraud products are designed to detect and prevent. So it's not all fraud transactions. It's the ones that the bank offers products that are designed to detect and prevent. That's important because that's the limiting factor here. Well, your opponent says there's certain things about the checks here that the bank should have called immediately, and therefore it doesn't show good faith and fair dealing because it didn't have the hologram and I don't know some other things about it. It was out of sequence and so forth. Does your bank have any obligation there? Your Honor, it's undisputed in this case that the products that we're talking about, the positive pay product, would have caught the unauthorized checks that are issued in this case. The duplicative check numbers that are identified in paragraph 39 of the plaintiff or the appellant here's complaint identify that they were duplicative check numbers of checks that had been cashed weeks earlier. That is specifically what positive pay is designed to prevent and detect before the checks are cashed. Let me ask you this. These checks that the plaintiff was using that it had purchased from a third-party provider, did the bank approve the use of those checks by the plaintiff before they undertook to use those checks in regard to that account? Your Honor, that is not something that's contained in the record in this case. So I am not aware of that being the case. Well, yeah, but prior to the forgery, the bank did negotiate checks from the plaintiff written on these checks that were obtained from the third-party provider. And the fact that the bank negotiated those checks would suggest that they approved the checks or at least didn't have any objection to them. You would agree to that, wouldn't you? Your Honor, I do believe that, yes, there were prior checks that were cashed that are like the checks that the plaintiff was using at the time of these unauthorized transactions. I'm looking at the check that was forged. It's hard to read on the copy, but it looks like check number 5038. And the checks that were not forged seem to have gone up to number 4247, which suggests a lot of check numbers were skipped before the forged check number. Isn't that something that the bank should have noticed, perhaps? Your Honor, cases like Cincinnati Insurance v. Wachovia and, in fact, the comments to the UCC recognize that with the high volume of commercial banking transactions, it's nearly impossible for banks to catch these sorts of alterations. Some people sit on checks for several months before cashing them. It would depend on how many checks are written from a particular commercial entity's account, how quickly the check numbers would move through. So that's why it's so important that commercial entities work with the bank and implement an anti-fraud product because, contrary to what appellant contends, actually it's the commercial entities that are in the best possible position to know what is authorized from its account and what are not. And that's why the positive pay and reverse positive pay programs are so simple but effective. Of course, the bank didn't think that purchasing that program was essential to having a bank account and the bank account having a certain level of safety in as much as the bank didn't require the customer to purchase that program. Instead, it simply disclaimed liability if the customer did not purchase the program. It was an optional thing that the customer could do. But that didn't absolve the bank of the basic banking regulations that required a certain level of operational regularity or, for lack of a better way to put it, due care in the management of the customer's accounts. You would agree to that, would you not? Your Honor, I would agree that the agreement shifts the responsibility in certain limited circumstances to the commercial entity, whereas we have here, they're in the best position to know whether or not checks are authorized from their account. So the agreement is clear that the bank in limited circumstances won't have liability if anti-fraud products that were available to the commercial entity were, in fact, designed to detect and prevent the certain type of fraud that is at issue in this case. So to answer your question, Your Honor, the agreement put the responsibility, as permitted under the UCC, put the responsibility on the commercial entity to bear the risk of that loss if they chose not to participate in those anti-fraud programs. Of course, we're not here attempting to decide if the bank is liable. We're only trying to decide if the plaintiff is plead enough to permit the case to go forward to determine if there's any liability. Why is the complaint deficient such that the case shouldn't essentially go forward at this point? And maybe I have some discovery as to what actually occurred here. Of course, Your Honor. Both issues that were raised on appeal here can be decided as a matter of law. So it is undisputed that the checks at issue in this case would have been caught by the anti-fraud products that were available to the appellant. It's also undisputed. Wait a minute. That's not undisputed. Your opposing counsel didn't agree to that. And I don't see anything that's been submitted to the court in your brief anywhere else that makes that indisputable. So, Your Honor, at paragraph 39 of the complaint, the appellant described, or at the time the plaintiff described, the fact that there were duplicative check numbers of checks that had previously been cashed. The descriptions of positive pay that are in the record and that specific type of fraud that was at issue with these unauthorized checks, as the district court found, would have been caught by positive pay. The district court's opinion. Well, we don't know that. I don't even know what the products that consist of that program are. And that hasn't been made clear by either party to the court. There's nothing here that lets me know that those forgers would have been caught by that program. There's just nothing before us one way or the other that would ascertain that. Your Honor, so there are both citations to the Cincinnati Insurance v. Wachovia decision which describes the positive pay program. So, if it would be helpful, I can provide some more detail about the program, which is outlined in both the cases that we've cited in our brief. That wasn't before the district court on the motion to dismiss, was it? Your Honor, the fact that positive pay was why the unauthorized checks that were cashed against Majestic's account were declined to be reimbursed was because of the positive pay program. Did the district court know all this at the time of the motion to dismiss? It did, Your Honor. So you're saying the district court found that the particular deficiencies in these fraudulent checks would, in fact, have been picked up by the product that you offered at the time? I believe the district court's opinion holds that it's undisputed that they would have, yes. How would the district court know that if the district court didn't even have the specific details of the program in front of him? And, in fact, as best I can understand, there's not just one specimen program. There are different iterations and options that could be purchased by the customer within the program based upon what the bank thinks its needs might be. Isn't that right? There are, in fact, a series of products that are available to commercial entities to protect against this sort of fraud. The... It was before the district court that the appellant in this case described the type of alterations in the unauthorized checks, and the court was able to take judicial notice of the descriptions of positive pay from other cases and from other sources. So you're out of time. Could I ask one other question? Absolutely. This paragraph that deals with the services that are available that the bank is relying upon comes, as I understand it, in this eight-page agreement that's kind of an addendum or something to your customer agreement. Is that right? It is, in fact, part of... There's a series of agreements that are a part of what the appellant was provided when he opened his account, and that's... These might be called the rules and regulations relating to business checking? Exactly, and that's part of the master services agreement. I go to page three, which is where this paragraph seems to appear, and relative to Mr. Doucette's argument, so I want him to be aware of this because I'm going to ask him the same question, the paragraph at issue in this case is at the end of a long section, the heading of which says, statements, duty to report unauthorized transactions and errors. And that's a fairly customary section in a banking agreement, in my experience, that basically says you've got to look at your account statement when you get it. And if you don't object that something was fraudulently paid within 30 days, we're not going to reimburse you even if we screwed up. That's basically what that says, right? It's putting the appellant on notice that there are products that will help prevent his account from fraud. No, no, no. You got your agreement in front of you? I do, in fact, Your Honor. The first paragraph doesn't have anything to do with products that are available. The first paragraph simply deals with imposing the obligation on your customers to look at the statements when they get it. I apologize, Your Honor, I thought you were focusing on the second paragraph. And in that first paragraph, even if the bank did violate its duty of care when they paid a check they shouldn't have paid, as long as the customer doesn't pick it up and complain about it, within 30 days after they get the statement, the bank absolves itself from liability, right? Your Honor, my... If you fail to notify us of errors within the 30 days of the date your statement is mailed or otherwise made available to you, you will have no liability, we will have no liability for such errors, nor be required to reimburse you for them. Dot, dot, dot. I do agree with you that that's... So the point is, in the same bigger paragraph that we're talking about here, every bank that I'm aware of disclaims responsibility to the customers if the customers don't look at their statements on a timely basis and report problems. So there can be no question that the banks have the ability to limit their duty of care by virtue in this and that paragraph of imposing an obligation on the customer, right? I would distinguish between the duty of care that we're talking about here and processing transactions when they occur versus limiting the liability after they occur. You're so worried that I'm trapping you into something that you're not even listening to the question, so I'm not getting anywhere. The point is, the first paragraph in this agreement disclaims the bank liability. No bank, no customer has ever successfully challenged that. You've just added another paragraph on there that deals with additional products that you have. So my point is, where if you'd been listening you would have said yes, is that clearly banks can disclaim liability because they do write in the agreement. The question is whether the next paragraph is reasonable or unreasonable. Thank you. Thank you, Your Honor. Any rebuttal? So now properly alerted, hoping you were listening to that. I agree with you. When you say that they can't disclaim the liability, clearly they can. And you're not challenging the first paragraph. Correct. Because your guy apparently caught the fact there was fraud within the 30 days, right? He said that within hours he called the bank. Yes, you're right. It doesn't matter. I agree. So what's the matter with the second paragraph? You can't say banks can't disclaim their liability. They can. It's right in the agreement. Nobody ever challenges that. So why can't they do what the second paragraph says? Well, I don't have the agreement right here in front of me, but the paragraph that we're concerned about is on page 18 of 23 where it gets into this. 18 of 23? What's been provided to us? It's on page 3 of 8. I don't have it right here. I don't know what you've got on page 3 of 8 on that. I've got the bank's agreement. Yeah. I don't know if it's formatting the way that that one was printed versus what's given out as a booklet. Page ID at the top, 18 of 23. Okay. On the agreement itself, it's page 3 of 8. So we're on the same page. Yeah, so it's probably printed on a little booklet is how we get to that one. And that's where it gets into we have no liability for any transaction. I think that goes to your point. Well, really, let's look at it and what it says. It starts out by saying, in addition. In other words, in addition to the disclaimer liability above that nobody challenges, in addition we also disclaim our liability if you don't purchase products that would have caught the fraud. So I'm just trying to figure out what's the matter with that. The matter is it's unreasonable. But all you've said is that it's unreasonable so far is they didn't describe what the fraud might be and or what the agreements might consist of. So is there anything more to your argument than that? I think a big step back is needed when we look at unreasonable. This is not just item 1, 2, 3, 4. Nobody in the public realm would ever dream out there in the community that their bank can completely absolve itself of any responsibility to ensure that they're not doing something to look at banks. No customer would ever dream they had a duty to read their account statements within 30 days either unless they actually read the agreement. And if they read the agreement, they'd read the paragraph we're talking about. That gets to the legal standard. That's for you all to decide. I mean, that's it. Is that you can say, yeah, this is reasonable, and I would tend to agree that 30 days notice is reasonable. You know, we see deadlines in the Truth in Lending Act and, you know, Regulation E. It's all over the place. You know, consumers, it's not open-ended. It's reasonable. And here they're saying, we're going to cut this thing out. What's amazing about this, really, is that two things. One was really important that was said, is that counsel said that these products can vary over time. There's a lot of different products, and they can vary all the time. That's why you have to go to Huntington to figure out what product applies this month for this account on this thing. Check positive pay is not listed in this thing. It just says, hey, we have some stuff. Come and take a look at it. And then you're supposed to go call Huntington and figure out what it is. And if you don't like it, go to a different bank. But, I mean, but that's somewhat the issue is, is that okay? Is that reasonable to say that? Because what's going to happen is, we all know what's going to happen. They have the product. They're doing it. They have the ability to do all this. They're telling you, hey, this particular situation, we could have figured this out ourselves, but we're not going to take that step unless you pay us money to do that. We can all see the writing on the wall, what happens when that's the law. All the banks are going to say, we have no liability, no responsibility. In our brief to the trial court, we made the example, they could literally have in crayon on a napkin made out to a ham sandwich a check. Huntington could pay it, and there would be no recourse for their clients to say, you guys should have caught this check. Huntington can have actual knowledge of the fraud, and here, in this contract, they're not liable because they have no liability whatsoever if you didn't buy their plan. This is like... Under the first paragraph, they can have actual knowledge of the fraud if you read it literally, and if you don't catch it within 30 days, you can't complain. Well, here, our client caught it within a day. So here, it would seem, then, that our client's claim, if that is the portion... The point is, that'd be awful because they can pay something knowing it's fraudulent. Well, they can already do that in the first paragraph. That would be a problem. Yeah. Okay. That would be unreasonable if they could do that because the implications are outrageous. I mean, they're huge. So what about this little kerfuffle we had earlier about whether you have agreed that the deficiencies in these checks would or would not have been caught by the products that were available that your client didn't buy? Do you concede that? I have no idea. No, I will not. Well, the district judge, I can't find his opinion in my book, but apparently the district judge said it's undisputed that they would have caught the fraud. Well, that's a problem. Did you stipulate to that before the district court? What's that? Did you stipulate to that before the district court? Absolutely not. But in your briefs, you haven't challenged that portion of the district court order, I don't think, have you? Well, I think... You didn't say the district court screwed up because he concluded this and that's wrong. We don't concede that. I don't know that I would go that far, especially because what we're dealing with really is an initial legal issue, I think. What we concede is a legal issue because that makes it clear one way or another on the issue of... This is also motion dismissed, right? So did we adequately plead? We have no idea what these programs were when we pled this, let alone what they covered, what they didn't cover, what their products did. We don't even know if they covered the time period or not, especially if counsel is saying that the programs vary. I have no idea. Have you or your client ever seen those programs? My client has never... What's that? Have you or your client ever seen these programs from the bank that purportedly would reduce the risk? Not to my recollection. I'm just stunned by this because your guy's account is hit for fraudulent checks. He notices that he complains. Immediately. Thank you for adding that for the fourth time. I apologize. Your guy catches it. He notifies the bank. And then there have been extensive efforts here made to complain to, I've forgotten who the regulatory agencies are, about how this is unreasonable. And you're saying that at no point you ever, anybody, any lawyer, you're the second lawyer or third lawyer? I've been on the case since... Okay. So at no point did you or your client ever ask the bank what are these agreements that supposedly you're relying upon? I don't think we have to. I didn't ask you whether you had to. At any point, you're telling me you've never... You don't need discovery to go on a bank branch. At no point has your client, have you or your client, ever even bothered to ask what these agreements say that they're relying upon, that you claim are unreasonable? We have not asked the bank on what agreements would have been available or products available from the day this account was opened in 2010 to the present day. That is accurate. Fair enough. Thank you. Thank you, Your Honors. Thank you. And the case is submitted. There being no further cases for argument, the court may be adjourned.